# LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**") is made and entered into as of April 23, 2025 by and between **LYNSKEY PERFORMANCE PRODUCTS, LLC**, a Tennessee limited liability company ("**Borrower**"), and **FIRSTBANK**, a Tennessee state bank ("**Lender**").

WITNESSETH:

WHEREAS, subject to the terms and provisions hereof, Lender has agreed to make available to Borrower certain credit for the purposes set forth herein; and

WHEREAS, Borrower and Lender desire to enter into this Agreement in order to set forth the terms, provisions and conditions governing the credit availability and the disbursement of the proceeds described herein.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants of the parties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and Lender hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1 Definitions.** In addition to the terms defined elsewhere in this Agreement, when used in this Agreement the following terms shall have the following meanings:

"**Advance**" means any and all extensions of credit made pursuant to this Agreement or any other Loan Document, including all Revolver Loans. The terms "Advance" and "Loan" (or the plural forms thereof) are used interchangeably in this Agreement.

"**Affiliate**" means a Person (a) which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, another Person; (b) which beneficially owns or holds 10% or more of any class of the Equity Interests of a Person; or (c) 10% or more of any class of Equity Interests of which is beneficially owned or held by another Person. For purposes hereof, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of any Equity Interest, by contract or otherwise.

"**Anti-Terrorism Law**" means any Requirement of Law related to money laundering or financing terrorism including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order 13224 (effective September 24, 2001).

"**Bank Product Debt**" means any and all Indebtedness or other obligations of Borrower or any of Borrower's Affiliates to Lender or any of Lender's Affiliates arising out of or relating to (a) Cash Management Services, (b) Rate Management Agreements, (c) card services, including credit cards (including purchasing cards and commercial cards), prepaid cards, including payroll, stored value and gift cards, merchant services processing, and debit card services, and/or (d) any other products provided by Lender or any of its Affiliates to Borrower or any of Borrower's Affiliates.

"**Bankruptcy Code**" means title 11 of the United States Code.

"**Blocked Person**" means any Person that (a) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the Office of Foreign Assets Control of the US Department of the Treasury ("OFAC") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs or (b) is publicly identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Requirement of Law.

"**Borrower's Books**" means all print, electronic or other media containing information relating to Borrower's existence, governance, assets, liabilities, business operations or financial condition, or any of the Collateral.

"**Business Day**" means any day of the week, excluding Saturdays, Sundays, each day that is a legal holiday under the laws of the State of Tennessee and each day on which Lender is otherwise closed for transacting business with the public.

"**Cash Management Services**" means any treasury or other cash management services provided from time to time by Lender or any of its Affiliates to Borrower or any of Borrower's Affiliates, including Deposit Accounts, automated clearing house ("ACH") origination and other funds transfer, depository (including cash vault and check deposit), zero balance accounts and sweeps, return items processing, controlled disbursement accounts, positive pay, lockboxes and lockbox accounts, account reconciliation and information reporting, payables outsourcing, payroll processing, trade finance services, investment accounts and securities accounts.

"**Change in Law**" means the occurrence, after the date hereof, of (a) the adoption or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any governmental authority; or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any governmental authority.

"**Change of Control**" means (a) the occurrence of any event (whether in one or more transactions) which results in a transfer of control of Borrower to a Person who is not an original owner of Equity Interests in Borrower on the Closing Date or (b) any merger or consolidation of or with Borrower or sale of all or substantially all of the Property of Borrower. For purposes of this definition "Control of Borrower" shall mean the power, direct or indirect, (x) to vote 50% or more of the Equity Interests of Borrower, or (y) to direct or cause the direction of the management and the policies of Borrower by contract or otherwise.

"**Closing**" means the occurrence of the execution and delivery of the Loan Documents and the funding of the Initial Revolver Loan, all of which shall occur on the Closing Date.

"**Closing Date**" means April 23, 2025.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral**" means (a) any and all Property and things of value in or against which a deed of trust lien, deed to secure debt lien, mortgage lien or other lien and/or security interest has been granted or may in the future be granted to secure to Lender repayment and performance of the Obligations; (b) any and all Property and things of value now held or which may in the future be held by or for the benefit of Lender as security for or for application to the Obligations; and (c) any and all Property and things of value assigned to or which may in the future be assigned to or for the benefit of Lender as security for or for application to the Obligations.

"**Conditions Precedent**" means those matters or events that must be completed or must occur or exist prior to Lender being obligated to fund any Advance, including those Conditions Precedent set forth in Section 4.1.

"**Debt Service**" means, as determined by Lender, the aggregate amount of principal and interest due and payable by Borrower over a Measurement Period with respect to the Loan (excluding the balloon principal payment due on the Maturity Date pursuant to the Note), the Term Loan and any other Indebtedness.

"**Debt Service Coverage Ratio**" means, as determined by Lender for any Measurement Period, the ratio of:

(a) EBIDA,

divided by

(b) Debt Service.

"**Default**" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

"**Default Rate**" means the maximum rate of interest allowed by law.

"**Disbursement Account**" means the Deposit Account maintained by Borrower with Lender for the purpose of depositing the proceeds of Advances.

"**Dollars**" and the sign "**$**" means lawful money of the United States of America.

"**EBIDA**" means, as determined by Lender for the applicable Measurement Period, (a) Borrower's net income after Taxes, plus (b) any amounts that have been deducted from net income for (i) interest expense, (ii) depreciation and/or (iii) amortization.

"**Equity Interest**" means all or any portion of the interest of (a) a shareholder in a corporation, (b) a partner (whether general or limited) in a partnership (whether general, limited or limited liability), (c) a member in a limited liability company, or (d) any other Person having any other form of equity security or ownership interest.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) a failure by any Plan to meet the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, in each instance, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its

"**Conditions Precedent**" means those matters or events that must be completed or must occur or exist prior to Lender being obligated to fund any Advance, including those Conditions Precedent set forth in Section 4.1.

"**Debt Service**" means, as determined by Lender, the aggregate amount of principal and interest due and payable by Borrower over a Measurement Period with respect to the Loan (excluding the balloon principal payment due on the Maturity Date pursuant to the Note), the Term Loan and any other Indebtedness.

"**Debt Service Coverage Ratio**" means, as determined by Lender for any Measurement Period, the ratio of:

(a) EBIDA,

divided by

(b) Debt Service.

"**Default**" means an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

"**Default Rate**" means the maximum rate of interest allowed by law.

"**Disbursement Account**" means the Deposit Account maintained by Borrower with Lender for the purpose of depositing the proceeds of Advances.

"**Dollars**" and the sign "**$**" means lawful money of the United States of America.

"**EBIDA**" means, as determined by Lender for the applicable Measurement Period, (a) Borrower's net income after Taxes, plus (b) any amounts that have been deducted from net income for (i) interest expense, (ii) depreciation and/or (iii) amortization.

"**Equity Interest**" means all or any portion of the interest of (a) a shareholder in a corporation, (b) a partner (whether general or limited) in a partnership (whether general, limited or limited liability), (c) a member in a limited liability company, or (d) any other Person having any other form of equity security or ownership interest.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) a failure by any Plan to meet the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, in each instance, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its

ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the Pension Benefit Guaranty Corporation ("**PBGC**") or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"**Event of Default**" means the occurrence of any event or condition specified in Section 7.1.

"**Financial Statements**" means any financial information of any Person delivered to Lender in connection with the Loan or pursuant to the Loan Documents.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time.

"**Guarantor**" means individually, and "**Guarantors**" means collectively, Mark Lynskey, Ruby Lynskey, Timothy Linskey, William David Lynskey, and any other Person executing a Guaranty with respect to any of the Obligations.

"**Guaranty**" means any instrument pursuant to which any Person now or hereafter guarantees the payment and/or performance of any of the Obligations.

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business), (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (e) all capital lease obligations of such Person, (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit, (g) all guarantees of such Person of the type of Indebtedness described in clauses (a) through (f) above, (h) all Indebtedness of a third party secured by any Lien on property owned by such Person, whether or not such Indebtedness has been assumed by such Person, and (i) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Equity Interests of such Person. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

"**Indemnitees**" means Lender and each of Lender's shareholders, officers, directors, employees, agents, representatives and Affiliates.

"**Indemnified Claim**" means any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, interest, actions, judgments, suits, awards, remedial response costs, expenses, payments or disbursements of any kind, character or nature whatsoever (including reasonable attorneys' fees and expenses), that may now or hereafter be instituted or asserted against, or suffered or incurred by, any Indemnitee.

"**Insolvency Proceeding**" means any action, case or proceeding commenced by or against a Person under any state, federal or foreign law, or any agreement of such Person, for (a) the entry of an order for

relief under any chapter of the Bankruptcy Code or other insolvency or debt adjustment law (whether state, federal or foreign), (b) the appointment of a receiver (or administrative receiver), trustee, liquidator administrator, conservator or other custodian for such Person or any part of its Property, (c) an assignment or trust mortgage for the benefit of creditors of such Person, or (d) the liquidation, dissolution or winding up of the affairs of such Person.

"**Lender Expenses**" means any and all costs and expenses, including attorney's fees, consultant's fees and litigation costs, suffered or incurred at any time by Lender in connection with or relating in any way to the Loan and/or any of the Collateral, including all costs and expenses incurred in connection with: (a) the negotiation, investigation, documentation and closing of the Loan (but excluding appraisal fees); (b) inspecting, auditing or examining Borrower, any of Borrower's Books and/or any Collateral; (c) correcting any default under any of the Loan Documents, performing any obligation of any Obligor pursuant to any of the Loan Documents, enforcing any provision of any of the Loan Documents or exercising any remedies under any of the Loan Documents, whether or not litigation is commenced; (d) gaining possession of, maintaining, administering, handling, preserving, insuring, storing, shipping, preparing for sale, advertising for sale, selling or foreclosing a Lien upon any of the Collateral, whether or not a sale is consummated; (e) any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrower or any other Person) in any way relating to the Loan, the Collateral, this Agreement or any of the other Loan Documents or any Obligor's affairs; (g) negotiating, structuring, drafting, reviewing or preparing any amendment, renewal, modification or waiver of this Agreement or any of the other Loan Documents; (g) establishing, preserving or defending the perfection, validity, priority or enforceability of Lender's Liens against any Collateral; and (h) the administration of the Loan, including all costs and expenses in connection with evaluating Borrower's compliance with all covenants, terms and conditions set forth in the Loan Documents.

"**Lien**" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute, or contract. The term "Lien" shall include reservations, exceptions, encroachments, easements, rights of way, statutory liens, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Property. For purposes of this Agreement, Borrower shall be deemed to be the owner of any Property that it has acquired or holds subject to a conditional sale agreement, financing lease, or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"**Loan**" shall be used interchangeably with the term "Advance" hereunder; provided that from time to time the term "Loan" is used to refer to the entire commitment evidenced hereby, including all Revolver Loans.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Security Agreement, all Guaranties, all Rate Management Agreements and any other documents, assignments, agreements and instruments executed and/or delivered at any time pursuant to or in connection with this Agreement and/or the Loan.

"**Material Adverse Effect**" means any result, effect, event, circumstance, change, occurrence, fact or development that, individually or in the aggregate with other results, effects, events, circumstances, changes, occurrences, facts or developments, whether or not related, is or could reasonably be expected to be materially adverse to: (a) the business, operations, Properties (including any of the Collateral) or condition (financial or otherwise) of Borrower; (b) the validity or enforceability of this Agreement or any of the other Loan Documents; (c) the Collateral, the Liens of Lender with respect to the Collateral or the priority of any such Liens; (d) the ability of any Obligor to perform its obligations under this Agreement or any of the other Loan Documents, including repayment of any of the Obligations when due; or (e) the ability of Lender to enforce or collect the Obligations or realize upon any of the Collateral in accordance with the

Loan Documents or applicable law.

"**Maturity Date**" means April 23, 2026.

"**Maximum Revolver Facility Amount**" means the amount of Six Hundred Thousand and 00/100 Dollars ($600,000.00).

"**Measurement Date**" means December 31 of each consecutive calendar year commencing December 31, 2024.

"**Measurement Period**" means the twelve (12) month period immediately trailing each Measurement Date.

"**Multiemployer Plan**" shall have the meaning set forth in Section 4001(a)(3) of ERISA.

"**Note**" means that certain Revolver Note dated of even date herewith executed by Borrower to the order of Lender.

"**Obligations**" means (a) all Indebtedness, obligations, covenants, and duties at any time or times owing by Borrower to Lender pursuant to or in connection with this Agreement or any other Loan Document or otherwise with respect to the Loan, whether direct or indirect, liquidated or unliquidated, absolute or contingent, now existing or hereafter incurred, contracted or arising, due or to become due, joint or several, including the principal of and interest on the Loan (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) and all reimbursement and indemnification obligations, (b) all Bank Product Debt and (c) all Rate Management Obligations.

"**Obligor**" means Borrower, each Guarantor, and each other Person that is at any time liable for the payment of the whole or any part of the Obligations or that has granted in favor of Lender a Lien upon any of any such Person's assets to secure payment of any of the Obligations.

"**Ordinary Course of Business**" means, with respect to any transaction involving any Person, the ordinary course of such Person's business, as conducted by such Person in accordance with past practices and undertaken by such Person in good faith and not for the purpose of evading any covenant or restriction in any Loan Document.

"**Organizational Documents**" means, with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, limited liability agreement, operating agreement, members' agreement, shareholders' agreement, partnership agreement, certificate of partnership, certificate of formation, trust agreement, voting trust, or similar agreement or instrument governing the formation or operation of such Person.

"**Outstanding Revolver Amount**" means, at any time, an amount equal to the aggregate principal amount of all Revolver Loans then outstanding.

"**Permitted Lien**" means any of the following: (a) Liens at any time granted in favor of Lender; (b) Liens for Taxes (excluding any Lien imposed pursuant to the provisions of ERISA) not yet due and delinquent or being Properly Contested; (c) normal and customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collection bank arising under the UCC on payment items in the course of collections; (d) Liens in existence immediately prior to the Closing Date

that are satisfied in full and released on the Closing Date as a result of the application of Borrower's cash on hand at the Closing Date or the proceeds of the Loan advanced on the Closing Date; (e) such other Liens as are disclosed by Borrower to Lender in writing and that Lender consents to in writing; and (f) the Liens set forth in the title policy approved by and delivered to Lender in connection with the Closing.

"**Person**" means any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, government, or any agency or political subdivision thereof, or any other form of entity.

"**Plan**" means an employee pension benefit plan that is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Internal Revenue Code and that is either (a) maintained for employees or (b) maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions.

"**Properly Contested**" means, in the case of any Indebtedness of Borrower (including any Taxes) that is not paid as and when due or payable by reason of Borrower's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (a) such Indebtedness is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (b) Borrower has established appropriate reserves as shall be required in conformity with GAAP; (c) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in a forfeiture or sale of any assets of Borrower; (d) no Lien is imposed upon any of Borrower's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of Lender (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (e) if the Indebtedness results from, or is determined by the entry, rendition or issuance against Borrower or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (f) if such contest is abandoned, settled or determined adversely (in whole or in part) to Borrower, Borrower forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"**Property**" or "**Properties**" means any interest in any kind of property or asset, whether real, personal, or mixed, or tangible or intangible.

"**Rate Management Agreements**" shall mean any agreements, devise or arrangements providing for payments which are related to fluctuations of interest rates, exchange rates, forward rates, or equity prices, including, but not limited to, dollar-denominated or cross currency interest rate exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts and warrants and any agreement pertaining to equity derivative transactions (e.g., equity or equity index swaps, options, caps, floors, collars and forwards), including without limitation any ISDA Master Agreement between Borrower and Lender or any Affiliate of Lender, and any schedules, confirmations and documents and other confirming evidence between the parties confirming transactions thereunder, all whether now existing or hereafter arising, and in each case as amended, modified or supplemented from time to time.

"**Rate Management Obligations**" means any and all obligations of Borrower, whether absolute, contingent or otherwise and howsoever and whenever (whether now or hereafter) created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under or in connection with (i) any and all Rate Management Agreements, and (ii) any and all cancellations, buy-backs, reversals, terminations or assignments of any Rate Management Agreement.

"**Requirement of Law**" means, as to any Person (a) the Organizational Documents of such Person,

(b) any federal, state or local law, treaty, ordinance, rule or regulation and (c) any order, decree or determination of a court, arbitrator or other governmental authority; in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Revolver Commitment**" means Lender's obligation to make Revolver Loans.

"**Revolver Loan**" shall have the meaning set forth in Section 2.1(a).

"**Security Agreement**" means the Security Agreement of even date herewith executed by Borrower in favor of Lender.

"**Solvent**" means, as to any Person, such Person (a) owns Property whose fair salable value is greater than the amount required to pay all of such Person's Indebtedness (including contingent, subordinated, unmatured and unliquidated liabilities), (b) owns Property whose present fair salable value (as defined below) is greater than the probable total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), of such Person as they become absolute and matured, (c) is able to pay all of its Indebtedness as such Indebtedness matures, (d) has capital that is not unreasonably small for its business and is sufficient to carry on its business and transactions and all business and transactions in which it is about to engage, (e) is not "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code, and (f) has not incurred (by way of assumption or otherwise) any obligations or liabilities (contingent or otherwise) under any of the Loan Documents, or made any conveyance pursuant to in connection therewith, with actual intent to hinder, delay or defraud either present or future creditors of such Person or any of its Subsidiaries. As used herein, the term "fair salable value" of a Person's assets means the amount that may be realized within a reasonable time, either through collection or sale of such assets at the regular market value, based upon the amount that could be obtained for such assets within such period by a capable and diligent seller from an interested buyer who is willing (but is under no compulsion) to purchase under ordinary selling conditions.

"**Subsidiary**" means any Person in which 50% or more of all Equity Interests (or those having a power to vote) is owned, directly or indirectly, by another Person, one or more other Subsidiaries of such other Person or such other Person and one or more other Subsidiaries of such other Person.

"**Taxes**" means any present or future taxes, levies, imposts, duties, fees, assessments, deductions, withholdings or other charges of whatsoever nature, including income, receipts, excise, property, sales, use, transfer, license, payroll, withholding, social security and franchise taxes now or hereafter imposed or levied by the United States or any other governmental authority and all interest, penalties, additions to tax and similar liabilities with respect thereto, but excluding, in the case of Lender, taxes imposed on or measured by the net income or overall gross receipts of Lender.

"**Term Loan**" means the term loan in the original principal amount of $1,250,000.00 extended by Lender to Borrower.

"**Term Loan Documents**" means any documents, agreements and instruments executed and/or delivered at any time pursuant to or in connection with the Term Loan.

"**UCC**" the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of Tennessee or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of each state.

**1.2 Other Terms**. Other terms contained in this Agreement shall have, when the context so

indicates, the meanings provided for by the UCC to the extent the same are used or defined therein. Without limiting the generality of the foregoing, the following terms shall have the meaning ascribed to them in the UCC: Account, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Electronic Chattel Paper, Equipment, Fixtures, Goods, General Intangible, Instrument, Inventory, Investment Property, Letter-Of-Credit Right, Payment Intangible and Software.

**1.3 Certain Matters of Construction**. The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Where the context requires, the use of singular references shall include the plural and vice versa, and the use of pronouns of any gender shall include any other gender. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding." The section titles, table of contents and list of exhibits appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All references to statutes shall include all amendments of same and implementing regulations any amendments of same and any successor statutes and regulations; to any Indebtedness shall include all renewals, extensions, modifications or refinancings thereof; to any agreement, instrument or other documents (including this Agreement and any of the other Loan Documents) shall include any and all amendments, modifications and supplements thereto and any and all substitutions, replacements, restatements, extensions or renewals thereof; to any Person (including Borrower or Lender) shall mean and include the successors and permitted assigns of such Person; to "including" and "include" shall be understood to mean "including without limitation"; or to the time of day shall mean the time of day on the day in question in Chattanooga, Tennessee, unless otherwise expressly provided in this Agreement. A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is cured to the extent permitted in the Loan Documents or waived in writing by Lender; and a Default or Event of Default shall "continue" or be "continuing" until such Default or an Event of Default has been cured to the extent permitted in the Loan Documents or waived in writing by Lender. All Loans shall be funded in Dollars and all Obligations shall be repaid in Dollars. Whenever in any provision of this Agreement Lender is authorized to take or decline to take any action (including making any determination) in the exercise of its "discretion," such provision shall be understood to mean that Lender may take or refrain to take such action in its sole and absolute discretion. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used.

**Section 1.4 Computation of Time Periods**. For purposes of computation of periods of time hereunder, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding", and the word "through" means "through and including".

## ARTICLE II
## THE LOAN

**2.1 Loan.**

(a) Agreement to Make Revolver Loans. Subject to the Conditions Precedent and the other terms and conditions of the Loan Documents, Lender agrees to make revolving credit Advances (each, a "**Revolver Loan**", and collectively, the "**Revolver Loans**") to Borrower from time to time during the period of time commencing on the Effective Date up to and including the last Business Day preceding the Maturity Date, not to exceed an aggregate principal amount outstanding at any time the Maximum Revolver Facility Amount, which Revolver Loans may be repaid and reborrowed in accordance with this Agreement.

(b) Initial Revolver Loan. Provided that Lender receives evidence satisfactory to Lender that all Conditions Precedent under Section 4.1 have been satisfied, Lender agrees to fund on the Closing Date a Revolver Loan (the "**Initial Revolver Loan**") in an amount to be determined by Lender in its discretion, which Initial Revolver Loan shall be used exclusively to (i) pay and satisfy in full an existing line of credit with FirstBank and (ii) fund certain of Borrower's costs and expenses in connection with the Closing. All other Revolver Loans shall be requested and made pursuant to Section 2.1(c).

(c) Requesting Revolver Loans. Borrower may request a Revolver Loan on any Business Day, provided that Borrower shall give Lender notice thereof in such form as may be required by Lender no later than 12:00 p.m. (noon) eastern time on the Business Day immediately preceding the requested date of funding, which notice shall be irrevocable and shall specify (i) the amount of the requested Revolver Loan, and (ii) the requested date of funding. Notices received by Lender after 12:00 p.m. (noon) eastern time shall be deemed received on the next Business Day before 12:00 p.m. (noon) eastern time. Such Revolver Loan will be made available to Borrower by Lender disbursing the proceeds of the Revolver Loan to the Disbursement Account. Lender is hereby authorized to make Revolver Loans based on instructions received from Borrower and Lender shall not be responsible for determining the authenticity of any such instructions.

(d) Limitation on Revolver Loans. Notwithstanding any other term or condition of any of the Loan Documents, Lender shall have no obligation to make any Revolver Loan (i) on or after the Revolver Maturity Date, (ii) if the Outstanding Revolver Amount equals or exceeds Maximum Facility Amount (an "**Overadvance**"), (iii) if an Overadvance would exist after the funding of the requested Revolver Loan, or (iv) if any Condition Precedent is not satisfied; provided, however, that Lender may fund the requested Revolver Loan in its discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default.

(e) Interest. The principal balance of the Revolver Loans shall bear interest as set forth in the Note, and principal and interest shall be due and payable as set forth in the Note. Notwithstanding any other provision of the Loan Documents, upon and after the occurrence of an Event of Default and while such Event of Default is continuing, the principal balance of the Loan shall bear interest at the Default Rate.

**2.2 Use of Proceeds**. The proceeds of the Revolver Loans (other than the Initial Revolver Loan) shall be used by Borrower for general working capital purposes and for no other purpose.

**2.3 Payments, Deposit Accounts, Authorization to Debit, Setoff; Prepayment**.

(a) All payments with respect to the Loan and all other Obligations shall be made to Lender on the date when due, in Dollars and in immediately available funds, without any deduction, offset or counterclaim.

(b) To secure the prompt payment and performance of all of the Obligations, Borrower hereby grants to Lender a continuing first priority security interest in and Lien upon all sums at any time outstanding to Borrower's credit on Lender's books and all of Borrower's Property at any time in Lender's possession, including all of Borrower's Deposit Accounts with Lender, whether now owned or existing or hereafter created, acquired or arising. Lender may debit any Deposit Account of Borrower subject to Lender's control and apply such amounts to the payment of any Obligations and Lender is irrevocably authorized to do so without the consent of Borrower. In addition to and not in limitation of the above, with respect to any deposits of Property of Borrower in Lender's possession or control, including any Deposit Accounts, whether now owned or existing or hereafter created, acquired or arising, after an Event of Default Lender shall have the right to set off all or any portion thereof, at any time, against any Obligations without prior notice or demand to Borrower.

(c) Whenever any payment of any of the Obligations shall be due on the day that is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day and, if the day for any payment of principal is extended by operation of law or otherwise, interest thereon shall be payable for such extended period of time.

(d) To the extent that Borrower makes a payment to Lender, or Lender receives payment from the proceeds of any Collateral or exercises its right of setoff, and such payment or the proceeds of such Collateral or setoff (or any part thereof) are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other Person, then to the extent of any loss of Lender, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment or proceeds have not been made or received and any such enforcement or setoff had not occurred.

(e) The principal balance of the Loan may be prepaid in whole or part without penalty; provided, however, that if a Rate Management Agreement is entered into by Borrower with Lender or an Affiliate of Lender, any prepayment, in whole or part, may result in either a net gain or loss to Borrower based on the then existing market conditions at the time of early termination.

**2.4 Fees and Lender Expenses.**

(a) On the Closing Date Borrower shall pay as directed by Lender the following:

(i) to Lender, a loan fee in the amount of $1,500.00 and a documentation fee in the amount of $250.00;

(iii) all Lender Expenses incurred up to and including the Closing Date, including all Lender Expenses in connection with the negotiation, investigation, documentation and closing of the Loan; and

(iv) all fees, costs and expenses in connection with the Closing, including all recording, filing or other fees in connection with the perfection of Lender's Lien relative to the Collateral.

(b) If, at any time or times from and after the Closing Date, regardless of whether or not any Event of Default then exists, Lender incurs any Lender Expenses, all such Lender Expenses:

(i) shall be Obligations secured by all of the Collateral;

(ii) shall be due and payable by Borrower to Lender upon demand and shall not be subject to rebate, refund or proration;

(iii) shall bear interest at the Default Rate from the date demanded until paid in full; and

(iv) are and shall be deemed to be for compensation for services and are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money.

**2.5 Maximum Interest.** Regardless of any provision contained in this Agreement or any other agreement or document executed in connection herewith, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Lender pursuant to the terms of this

Agreement or any other Loan Documents and that are deemed interest under any Requirement of Law exceed the highest rate permissible under any Requirement of Law, which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. No agreements, conditions, provisions or stipulations contained in this Agreement or any of the other Loan Documents or the exercise by Lender of the right to accelerate the payment or the maturity of all or any portion of the Obligations or the exercise of any option whatsoever contained in any of the Loan Documents, or the prepayment by Borrower of any of the Obligations, or the occurrence of any contingency whatsoever, shall entitle Lender to charge or receive, in any event, interest or charges, amounts, premiums or fees deemed interest by any Requirement of Law (such interest, charges, amounts, premiums and fees referred to collectively as "**Interest**") in excess of the maximum rate allowable under any Requirement of Law and in no event shall Borrower be obligated to pay Interest exceeding such maximum rate, and all agreements, conditions, or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Borrower to pay Interest exceeding the maximum rate allowable under any Requirement of Law shall be without binding force or effect, at law or in equity, to the extent only of the excess of Interest over such maximum rate. If any Interest is charged or received in excess of the maximum rate allowable under any Requirement of Law ("**Excess**"), Borrower acknowledges and stipulates that any such charge or receipt shall be the result of an accident and bona fide error, and such Excess, to the extent received, shall be applied first to reduce the principal Obligations in connection with the Loan and the balance, if any, returned to Borrower, it being the intent of the parties hereto not to enter into a usurious or other illegal relationship. The right to accelerate the maturity of the Obligations does not include the right to accelerate any Interest that has not otherwise accrued on the date of such acceleration, and Lender does not intend to collect any unearned Interest in the event of any such acceleration. For the purpose of determining whether or not the Excess has been contracted for, charged or received by Lender, all Interest at any time contracted for, charged or received from Borrower in connection with this Agreement and any of the Loan Documents shall, to the extent permitted by any Requirement of Law, be amortized, prorated, allocated and spread in equal parts throughout the full term of the Loan. The provisions of this Section shall be deemed to be incorporated into every Loan Document (whether or not any provision of this Section is referred to therein).

**2.6 Loan Account; Application of Payments and Collections.** Lender shall maintain in accordance with its usual and customary practices an account or accounts (a "**Loan Account**") evidencing the Obligations, including the amount of principal and interest payable to Lender from time to time hereunder. Any failure of Lender to make an entry in the Loan Account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrower under the Loan Documents to pay an amount owing to Lender. The entries made in the Loan Account shall constitute rebuttably presumptive evidence of the information contained therein. Borrower irrevocably waives the right to direct the application of any and all payments and collections at any time or times hereafter received by Lender from or on behalf of Borrower, and Borrower does hereby irrevocably agree that Lender shall have the continuing exclusive right to apply and reapply any and all such payments and collections received at any time or times hereafter by Lender or its agent against the Obligations, in such manner as Lender may deem advisable in its discretion.

**2.7 Access to Borrower's Books.** Lender shall have the right, at any time or times hereafter, during Borrower's usual business hours, or during the usual business hours of any Person having control over the records of Borrower, or at any time when an Event of Default is continuing, to inspect and verify Borrower's Books for any purpose relating to the Loan.

**2.8 Joint and Several Liability.** If more than one Person is identified herein as a Borrower, then each such Person identified as a Borrower shall be jointly and severally liable with the other Borrower for the payment and performance of all of the Obligations.

**2.9 Unconditional Nature of Liabilities.** Borrower's liability with respect to the Advances

and other Obligations shall, to the fullest extent permitted by applicable law, be unconditional irrespective of (a) the validity, enforceability, avoidance or subordination of any of the Obligations or of any document evidencing or securing any part of the Obligations, (b) the absence of any attempt to collect any of the Obligations from any other Obligor or any Collateral or other security therefor, or the absence of any other action to enforce the same, (c) the waiver, consent, extension, forbearance or granting of any indulgence by Lender with respect to any Loan Documents, (d) the failure by Lender to take any steps to perfect or maintain the perfected status of its security interest in or Lien upon, or to preserve its right to, any of the Collateral or Lender's release of any Collateral or its termination or release of any Liens upon any Collateral, (e) the release or comprise, in whole or in part, of the liability of any Obligor for the payment of any of the Obligations, (f) any amendment or modification of any of the Loan Documents or any waiver of a Default or Event of Default, (g) any increase in the amount of any interest, fees or other charges payable in connection therewith, or (h) any other circumstances that might constitute a legal or equitable discharge (other than the indefeasible payment or satisfaction of such obligations) or defense of any Obligor. Borrower shall be deemed to have waived any provision under applicable law that might otherwise require Lender to pursue or exhaust its remedies against any Collateral or Obligor before pursuing Borrower or any other Obligor. Borrower consents that Lender shall be under no obligation to marshal any assets in favor of any Obligor or against or in payment of any or all of the Obligations.

**2.10 Subordination**. Borrower subordinates any claims, including any right of payment, subrogation, contribution and indemnity, that it may have from or against any other Obligor, and any successor or assign of the Obligor, including any trustee, receiver or debtor-in-possession, howsoever arising, due or owing or whether heretofore, now or hereafter existing, to the full payment of all of the Obligations.

**2.11 Increased Costs; Capital Adequacy.**

(a) If any Change in Law shall:

(i) impose modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, Lender;

(ii) subject Lender to any Tax with respect to any Loan or Loan Document, or change the basis of taxation of payments to Lender in respect thereof; or

(iii) impose on Lender or any other condition, cost or expense affecting any Loan or Loan Document;

and the result thereof shall be to increase the cost to Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount) then, upon request of Lender, Borrower will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b) If Lender determines that any Change in Law affecting Lender or any of its Affiliates regarding capital requirements has or would have the effect of reducing the rate of return on Lender's or any of its Affiliates' capital as a consequence of this Agreement or any Loans to a level below that which Lender or such Affiliate could have achieved but for such Change in Law (taking into consideration Lender's and such Affiliate's policies with respect to capital adequacy), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate it or such Affiliate for any such reduction suffered.

(c) Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of its right to demand such compensation, but Borrower shall not be required to compensate Lender for any increased costs incurred or reductions suffered more than 120 days prior to the date that Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of Lender's or any of its Affiliates' intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the period referred to above shall be extended to include the period of retroactive effect thereof).

## ARTICLE III
## TERM AND TERMINATION

**3.1 Term.** The Revolver Commitment shall become effective on the date of this Agreement (subject to satisfaction of the conditions set forth in Section 4 hereof) and shall expire at the close of business on the Maturity Date, unless earlier terminated by Lender as provided herein.

**3.2 Termination.** At any time after the occurrence of an Event of Default, Lender may terminate the Revolver Commitment immediately without notice or demand to Borrower, in addition to any and all other remedies available to Lender pursuant to the Loan Documents, at law or in equity.

**3.3 Effect of Expiration or Termination.** From and after the expiration of the Revolver Commitment, any outstanding Revolver Loans shall continue to be due and payable to Lender pursuant to the terms of this Agreement, the Note and the other Loan Documents. In the event of a termination of the Revolver Commitment by Lender upon the occurrence of an Event of Default, all Obligations shall become immediately due and payable without notice to or demand upon Borrower and shall be paid to Lender in cash or by wire transfer of immediately available funds. No expiration or termination of the Revolver Commitment shall in any way affect any of Lender's rights or remedies hereunder, any of the Obligations (including Borrower's obligation to pay all of the Obligations on the effective date of such termination) or any of Lender's Liens against the Collateral, all of which shall survive the expiration or termination of the Revolver Commitment.

## ARTICLE IV
## CONDITIONS PRECEDENT

**4.1 Conditions Precedent.** Lender shall not be obligated to fund the Initial Revolver Loan or any other Revolver Loan, or make any other extension of credit hereunder, unless each of the following Conditions Precedent has been satisfied, in the sole opinion of Lender:

(a) All of the following shall have been delivered to Lender in form and substance satisfactory to Lender in its discretion:

(i) Executed Loan Documents. The Loan Documents duly executed by the applicable parties;

(ii) Resolutions; Certificates. Copies of the approving/authorizing resolutions and Secretary's or similar certificates of Borrower and each Guarantor who is not a natural Person;

(iii) Organizational Documents. Copies of the Organizational Documents of Borrower and each Guarantor who is not a natural Person;

(iv) Certificates of Existence. Certificates of existence/good standing for Borrower and each Guarantor who is not a natural Person, current as of the Closing Date;

(v) Financial Statements; Tax Returns. Such Financial Statements and Tax returns of Borrower and each Guarantor as Lender may reasonably request;

(vi) UCC-11. The results of such UCC-11 searches as may be conducted by Lender in its discretion;

(vii) Payoff Information. A final payoff letter from any Person whose outstanding Indebtedness is to be satisfied by proceeds of the Initial Revolver Loan and/or who holds a Lien against any of the Collateral, and evidence satisfactory to Lender that all Liens for the benefit of such Person against such Collateral will be released upon payoff of the associated Indebtedness;

(viii) Evidence of Insurance. Satisfactory evidence of all insurance required pursuant to the Loan Documents;

(ix) Fees and Lender Expenses. Payment of all fees and Lender Expenses pursuant to Section 2.4(a);

(x) Additional Items. Such additional items as Lender or the issuer of Lender's title insurance policy may reasonably request.

(b) All of the requirements set forth in Section 2.1(b) (with respect to the Initial Revolver Loan) and 2.1(c) (with respect to all other Revolver Loans) shall have been satisfied in the sole opinion of Lender;

(c) No Overadvance shall exist, and no Overadvance would exist after the funding of the requested Revolver Loan;

(d) No Default or Event of Default shall have occurred and be continuing;

(e) All representations and warranties of each Obligor set forth in the Loan Documents shall be true and correct in all material respects;

(f) There shall have been no Material Adverse Effect, and no event has occurred which could reasonably be expected to have a Material Adverse Effect;

(g) There shall be no Liens outstanding against the any of the Collateral, except for Permitted Liens.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the Loan or otherwise extend credit as provided in any of the Loan Documents, Borrower makes the following representations and warranties, all of which shall survive the execution and delivery of the Loan Documents, and, unless otherwise expressly provided herein, such representations and warranties shall be deemed made as of the date hereof and as of the date of each request for an Advance or other extension of credit:

**5.1 Status.** Borrower is a Tennessee limited liability company. Borrower has the power to

own and operate its Properties, to carry on its business as now conducted and to enter into and to perform its obligations under this Agreement and the other Loan Documents to which it is a party. Borrower is duly qualified to do business and in good standing in each jurisdiction in which a failure to be so qualified could reasonably be expected to have a Material Adverse Effect.

5.2 **Authorization**. Borrower has full legal right, power and authority to conduct its business and affairs as now conducted and as hereafter intended to be conducted. Borrower has full legal right, power and authority to enter into and perform its obligations hereunder, without the further consent or approval of any other Person. The execution and delivery of this Agreement, the borrowing hereunder, the execution and delivery of each Loan Document to which any Obligor is a party and the performance by each Obligor of its respective obligations thereunder are within the powers of such Obligor and have been duly authorized by all necessary action properly taken, have received all necessary consents and approvals, if any were required, and do not and will not contravene or conflict with any Requirement of Law or any agreement binding upon any Obligor or its Property. The officer executing this Agreement and all of the other Loan Documents to which any Obligor is a party is duly authorized to act on behalf of such Obligor.

5.3 **Validity**. Each Loan Document to which any Obligor is a party constitutes the legal, valid, and binding obligations of such Obligor, enforceable against such Obligor in accordance with its terms.

5.4 **No Conflicts**. The execution and delivery of this Agreement and the other Loan Documents, the consummation of the transactions contemplated by such Loan Documents and the performance of the obligations of each Obligor under and by virtue of such Loan Documents will not result in any breach of, or constitute a default under, any instrument or agreement to which any Obligor is a party or by which any Obligor or its Property may be bound or affected.

5.5 **Litigation**. There are no actions or proceedings pending against Borrower before any court or administrative agency, and Borrower has no knowledge or belief or any pending, threatened or imminent, governmental investigations or claims, complaints, actions or prosecutions involving Borrower, which could reasonably be expected to have a Material Adverse Effect.

5.6 **Financial Condition**. All Financial Statements and other information delivered to Lender relating to any Obligor are true and correct in all respects and fairly and reasonably present such Obligor's financial condition. There has been no material adverse change in the financial condition of any Obligor since the date of the most recent of such Financial Statements submitted to Lender. Borrower has no knowledge of any liabilities, contingent or otherwise, which are not reflected in such Financial Statements and information, and no Obligor has entered into any special commitments or contracts which are not reflected in such Financial Statements or information which could reasonably be expected to have a Material Adverse Effect. Borrower is, and after consummating the transactions described in the Loan Documents will be, Solvent.

5.7 **Taxes**. Borrower has filed all federal, state and other tax returns that are required to be filed, and have paid all Taxes shown on said returns as well as all Taxes (including withholding, FICA and ad valorem Taxes) shown on all assessments received by it to the extent that such Taxes are not being Properly Contested; and Borrower is not subject to any federal, state or local tax Liens or has received any notice of deficiency or other official notice to pay any Taxes.

5.8 **Title to Assets**. Borrower has good title to its assets (including those shown or included in its Financial Statements and including the Collateral), and the same are not subject to any Liens other than Permitted Liens.

**5.9 Material Agreements**. Borrower is not a party to any agreement or instrument adversely affecting its business, assets, operations or condition (financial or otherwise), nor is Borrower in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained in any agreement or instrument where such default could reasonably be expected to have a Material Adverse Effect.

**5.10 Compliance With Laws**. Borrower neither (a) is in violation of any Requirement of Law, (b) has failed to obtain any license, permit, certificate or other governmental authorization necessary for the conduct of its business or the ownership and operation of its assets, nor (c) has received any notice from any governmental authority, and to its knowledge no such notice is pending or threatened, alleging that Borrower has violated, or has not complied with, any Requirement of Law.

**5.11 Governmental Authorizations, Permits, Licenses and Accreditation; Other Rights**. Borrower has all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, accreditations and other authorizations necessary for the lawful conduct of its business and/or operations wherever now conducted and as planned to be conducted, pursuant to all Requirements of Law except for licenses to be granted after construction is complete. Borrower is not in default under any of such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, accreditations or other authorizations, and no event has occurred, and no condition exists, that with the giving of notice, the passage of time or both would constitute a default thereunder or would result in the suspension, revocation, impairment, forfeiture or non-renewal of any thereof, except to the extent that the cumulative effect of all such defaults, events, conditions, suspensions, revocations, impairments, forfeitures and non-renewals cannot reasonably be expected to have a Material Adverse Effect. The continuation, validity and effectiveness of all such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, accreditations and other authorizations will not be adversely affected by the transactions contemplated by this Agreement. Borrower knows of no reason why it will not be able to maintain or obtain and then maintain after the date hereof all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, accreditations and other authorizations necessary or appropriate to conduct its business and/or operations as now conducted and presently planned to be conducted.

**5.12 Capital Structure**. Borrower has disclosed to Lender in writing, as of the date hereof: the identity of each Person owning any of the Equity Interests of Borrower; the percentage of Equity Interests owned by each Person; the number of authorized and issued Equity Interests of Borrower. There are no outstanding options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell, or any Equity Interests or obligations convertible into, or any powers of attorney relating to, Equity Interests of Borrower.

**5.13 Brokers**. There has been no mortgage or loan broker in connection with this loan transaction and Borrower shall indemnify, defend and hold the Lender harmless from and against any claim of compensation payable to any mortgage or loan broker.

**5.14 ERISA**. (a) Each Plan maintained by or on behalf of Borrower is Solvent and has at all times been maintained, by its terms and in operation, in accordance in all material respects with ERISA and all other applicable Requirements of Law.

(b) Except for liabilities and expenses that become payable and are timely paid pursuant to the terms and usual operations of the Plans, Borrower currently is not, and to its knowledge will not become, subject to any material liability (including withdrawal liability), Tax or penalty whatsoever to any Person whomsoever with respect to any Plan.

(c) Borrower has made full and timely payment of all amounts (i) required to be contributed under the terms of each Plan and all Requirements of Law and (ii) required to be paid as expenses of each Plan.

(d) No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.

(e) Borrower is not required to contribute to or is not contributing to a Multiemployer Plan. Borrower has no withdrawal liability to any Multiemployer Plan, nor has any reportable event referred to in Section 4043(b) of ERISA occurred that has resulted or could result in liability of Borrower; and Borrower does not have any reason to believe that any other event has occurred that has resulted or could result in liability of Borrower as set forth above.

**5.15 Labor Relations**. Borrower is not a party to or bound by any collective bargaining agreement, management agreement or consulting agreement. On the date hereof, there are no material grievances, disputes or controversies with any union or any other organization of Borrower's employees, or, to Borrower's knowledge, any threats of strikes, work stoppages or any asserted pending demands for collective bargaining by any union or organization.

**5.16 Anti-Terrorism Laws**. Neither Borrower nor any of its Affiliates is in violation of any Anti-Terrorism Law; engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law; is a Blocked Person. Neither Borrower nor any of its Affiliates conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person or deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any Anti-Terrorism Law.

**5.17 Investment Company Act**. Borrower is not an "investment company" as defined in the Investment Company Act of 1940.

**5.18 No Insider Status**. Borrower is not, and no Person having "control" (as that term is defined in 12 U.S.C. § 375(b)(5) or in regulations promulgated pursuant thereto) of Borrower is, an "executive officer," "director," or "principal shareholder" (as those terms are defined in 12 U.S.C. § 375(b) or in regulations promulgated pursuant thereto) of Lender, of a bank holding company of which Lender is a Subsidiary, or of any Subsidiary of a bank holding company of which Lender is a Subsidiary.

**5.19 Statements Not False or Misleading**. No representation or warranty given as of the date hereof by any Obligor contained in this Agreement or other Loan Document, or any statement in any document, certificate or other instrument furnished or to be furnished to any Lender by any Obligor, taken as a whole, contains or will (as of the time so furnished) contain any untrue statement of a material fact, or omits or will (as of the time so furnished) omit to state any material fact which is necessary in order to make the statements contained therein not misleading.

**5.20 Business and Collateral Locations**. Borrower's chief executive office, principal place of business, office where Borrower's business records are located and all other places of business of Borrower (including places of business where any Collateral is kept or maintained) all have been correctly and completely described to Lender in writing; and none of the Collateral is in the possession of any Person other than Borrower and all tangible items of the Collateral are located in, on or about Borrower's principal place of business as described to Lender.

# ARTICLE VI
# COVENANTS AND CONDITIONS

**6.1 Affirmative Covenants and Conditions**. Borrower hereby covenants and agrees with Lender that:

(a) Financial Statements. Borrower will maintain complete and accurate records and books of account, and will cause to be prepared and furnished to Lender, in form and substance acceptable to Lender:

(i) within ten (10) days after filing, a copy of Borrower's complete federal income tax return, with all schedules, K-1s and other attachments;

(ii) within ten (10) days after filing, a copy of each Guarantor's complete federal income tax return, with all schedules, K-1s and other attachments;

(iii) within thirty (30) days after the last day of each consecutive calendar year, a Financial Statement of each Guarantor, which (i) must be certified as true and correct by such Guarantor, (ii) which must be prepared and certified on Lender's form and (iii) which must separately identify those assets owned by such Guarantor individually and those assets owned by such Guarantor with or through any other Person; and

(iv) within ten (10) days after Lender's request, such other financial information regarding Borrower and/or any Guarantor as Lender may request from time to time..

(b) Liens. Borrower will promptly satisfy and pay all claims for labor or materials, rents, and other obligations that, if unpaid, will or might become a Lien against any of the Collateral. In the event any such liability or obligation is Properly Contested, Borrower shall establish a reserve with Lender in an amount and on terms acceptable to Lender in its discretion or make other arrangements satisfactory to Lender in its discretion.

(c) Insurance. Borrower will maintain or cause to be maintained, in amount, form and substance, and with insurers satisfactory to Lender, and will provide to Lender evidence of, the insurance required under the Security Agreement.

(d) Notice. Borrower will promptly give Lender written notice of the occurrence of any of the following:

(i) knowledge by Borrower of the occurrence of a Default or an Event of Default;

(ii) any event or transaction which has or could reasonably be expected to have a Material Adverse Effect;

(iii) the occurrence of any material adverse change in the assets, liabilities, financial condition, business, operations, affairs, or circumstances of Borrower, or any deviation in or change from the representations, warranties or covenants of any Obligor in this Agreement or in the other Loan Documents;

(iv) the receipt by Borrower of notice of any Lien, other than a Permitted Lien, affecting any of the Collateral; or

(v) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, results in, or could reasonably be expected to result in, a Material Adverse Effect.

(e) Further Assurances. Borrower shall promptly upon request of Lender (i) correct any defect, error or omission which may be discovered in the contents of any Loan Document or in the execution or acknowledgement thereof; (ii) execute, acknowledge, deliver and record or file such further instruments (including, without limitation, mortgages, deeds of trust, security agreements, financing statements and specific assignments of rents or leases) and do such further acts, in either case as may be necessary, desirable or proper in Lender's discretion to (1) carry out more effectively the purposes of the Loan Documents, (2) protect and preserve all Liens granted in favor of Lender pursuant to any of the Loan Documents or to subject to Lender's Lien any Property intended to be covered thereby, or (iii) protect the interest and security interest of Lender in the Collateral against the rights or interests of third parties. Borrower hereby appoints Lender as its attorney-in-fact, coupled with an interest, to take the above actions and to perform such obligations on behalf of Borrower, at Borrower's sole expense, if Borrower fails to comply fully with Borrower's obligations under this Section.

(f) Taxes. Borrower will pay and discharge all Taxes affecting Borrower or any of the Collateral prior to the date on which such Taxes become delinquent or any penalties attached thereto, except and to the extent only that such Taxes are being Properly Contested, and, if requested by Lender, shall provide proof of payment or, in the case of withholding or other employee taxes, deposit of payments required by applicable law or other arrangements are made that are satisfactory to Lender in its discretion.

(g) Reimbursement for Lender Expenses. Borrower will promptly reimburse Lender for all sums expended by Lender which constitute Lender Expenses.

(h) Payment and Performance of Obligations. Borrower will timely pay and perform, as the case may be, all of the Obligations.

(i) Existence. Borrower will maintain its existence and good standing in the state of its organization, and its qualification and good standing in each jurisdiction in which a failure to be so qualified could reasonably be expected to have a Material Adverse Effect.

(j) Compliance with Laws, Etc. Borrower will comply with all Requirements of Law applicable to Borrower and/or its Properties, except where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(k) Deposit Accounts. As consideration for the interest rate charged, Borrower shall maintain all of its depository and treasury management accounts with Lender.

(l) Debt Service Coverage Ratio Covenant. A Debt Service Coverage Ratio equal to or greater than 1.25 to 1.00 shall be maintained at all times. Compliance with this covenant shall be measured on and as of each Measurement Date for the applicable Measurement Period.

**6.2 Negative Covenants.** Borrower hereby covenants and agrees that, without Lender's prior written consent, Borrower will not:

(a) Fundamental Changes. Permit any Change of Control to occur, except for changes in the composition of Borrower's board of directors in the Ordinary Course of Business; merge, reorganize, or consolidate with any Person, or liquidate, wind up its affairs or dissolve itself, in each case whether in a

single transaction or in a series of related transactions; acquire all or substantially all of the assets, or any of the Equity Interests, of another Person; change its name or conduct business under any fictitious name; change its federal employer identification number, organizational identification number or state of organization; relocate its chief executive office or principal place of business; suspend or otherwise discontinue all or any material part of its business operations; sell, transfer or otherwise dispose of any of its assets in any material manner other than in the Ordinary Course of Business; make any loans, advances or other transfers of assets to any other Person; guarantee or otherwise become in any way liable for any Indebtedness of another Person; or amend, modify or otherwise change any of the terms or provisions in any of its Organizational Documents, except for changes that do not affect in any way Borrower's authority to enter into and perform the Loan Documents to which it is a party, the perfection of Lender's Liens against any of the Collateral, or Borrower's authority or obligation to perform and pay the Obligations.

(b) Assignment. Assign or transfer, or attempt to assign or transfer, any of Borrower's rights, remedies, powers, duties, liabilities or obligations arising under or pursuant to this Agreement or any of the Loan Documents.

(c) Liens. Create, incur, assume or suffer to exist any Lien on any of the Collateral, except Permitted Liens.

(d) ERISA. Withdraw from participation in, permit the termination or partial termination of, or permit the occurrence of any other event with respect to any Plan maintained for the benefit of Borrower's employees under circumstances that could result in liability to the PBGC from any Multiemployer Plan described in Section 4001(a)(3) of ERISA which covers Borrower's employees.

(e) Use of Proceeds. Permit the proceeds of the Loan to be used for any purpose other than the purposes set forth in Section 2.2.

(f) Additional Indebtedness. Incur any Indebtedness for borrowed money, other than the Loan, that is secured in whole or part by an interest in any of the Collateral.

## ARTICLE VII
## EVENTS OF DEFAULT/REMEDIES

**7.1 Events of Default**. The occurrence or existence of any one or more of the following events or conditions shall constitute an Event of Default under this Agreement:

(a) Borrower fails to pay any of the Obligations within ten (10) days of the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise).

(b) Borrower breaches, or fails or neglects to perform, keep or observe, any covenant or agreement contained in Section 6.1(e) or Section 6.2.

(c) Any representation or warranty made by any Obligor in this Agreement or in any other Loan Document, or which is contained in any certificate, instrument, document, opinion or financial or other statement furnished at any time under or in connection with this Agreement or any Loan Document shall prove to have been incorrect, false or misleading in any material respect on or as of the date made or deemed made.

(d) Borrower breaches, or fails or neglects to perform, keep or observe, any other term, provision, condition, covenant or agreement set forth in this Agreement (other than those referred to in clauses (a) through (c), above, or (e) through (p), below), and Borrower does not, within ten (10) days after

the occurrence of such breach, failure or neglect, either (i) cure such breach, failure or neglect, or (ii) provide Lender with a written plan of cure thereof reasonably acceptable to Lender and such plan of cure has been commenced by Borrower. If a written plan of cure is accepted by Lender, Borrower shall, when requested by Lender, advise Lender, in writing, of the status of such cure. At any time after Lender's acceptance of Borrower's written plan of cure, if Lender, in the exercise of reasonable judgment, determines that such written plan of cure or the progress of Borrower thereunder is not acceptable, Lender shall provide written notice thereof to Borrower and Borrower shall cure such failure or neglect within ten (10) days of such written notice.

(e) Any Person (other than Lender) breaches, or fails or neglects to perform, keep or observe, any term, provision, condition, covenant or agreement in any of the Loan Documents, including any Rate Management Agreement, subject to any applicable cure period.

(f) The occurrence of a breach or default in connection with the Term Loan or under any of the Term Loan Documents, subject to any applicable cure period.

(g) Any Obligor breaches, or fails or neglects to perform, keep or observe, any term, provision, condition, covenant or agreement in any present or future agreement among such Obligor and Lender or any present or future instrument executed by such Obligor for the benefit of Lender, subject to any applicable cure period.

(h) There is a material impairment of the prospect of repayment of all or any portion of the Obligations owing to Lender or a material impairment of the value or priority of Lender's security interests in the Collateral, or Lender reasonably deems itself to be insecure.

(i) An Insolvency Proceeding is commenced by Borrower, or is commenced against Borrower and not dismissed within sixty (60) days thereafter.

(j) Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, and Borrower does not cure the same within thirty (30) days of such occurrence.

(k) Any Obligor dies (if a natural Person) or is voluntarily or involuntarily dissolved (if not a natural Person), provided that in the event of an involuntary dissolution such involuntary dissolution is not cured within thirty (30) days after such Obligor is notified of such involuntary dissolution, and further provided that in the event of the death of a Guarantor, Borrower shall have a period of one hundred eighty (180) days from the date of such Guarantor's death to provide Lender with a substitute guarantor acceptable to Lender in its discretion. Any such substitute guarantor must execute and deliver to Lender a Guaranty in the same form and content as the Guaranty executed by the deceased Guarantor in connection with the Loan and such other documents as may be required by Lender in its discretion. Nothing herein shall be construed to require Lender to approve any proposed substitute guarantor and the decision of whether or not to approve a proposed substitute guarantor is in Lender's discretion.

(l) Any Guarantor shall attempt to revoke any Guaranty, shall repudiate or dispute such Guarantor's liability thereunder, or shall be in default under the terms thereof, or shall fail to confirm in writing, promptly after receipt of Lender's written request therefor, such Guarantor's ongoing liability under the Guaranty in accordance with the terms thereof.

(m) There shall occur any event or condition that has, or could be reasonably expected to have, a Material Adverse Effect, and Borrower does not cure the same within thirty (30) days of such occurrence.

(n) Any Obligor shall challenge in any action, suit or other proceeding the validity or enforceability of any of the Loan Documents, the legality or enforceability of any of the Obligations or the perfection or priority of any Lien granted to Lender, or any of the Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by Lender in accordance with the terms thereof.

(o) An ERISA Event shall have occurred that, in the opinion of Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect.

(p) An Overadvance shall exist and is not cured within ten (10) days after Borrower's receipt of written notice from Lender.

7.2 **Remedies**. Upon and after the occurrence of an Event of Default, Lender may, at its election, without notice of its election and without notice to or demand upon any Obligor, do any one or more of the following:

(a) Declare any or all Obligations, whether arising pursuant to this Agreement or otherwise, to be immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower to the fullest extent permitted by law;

(b) Cease and/or temporarily suspend advancing money or extending credit to or for the benefit of Borrower under any of the Loan Documents or any other agreement between Borrower and Lender;

(c) Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of Lender, but without affecting: (i) Lender's rights pursuant to the Loan Documents or otherwise; (ii) Lender's security interest in the Collateral; or (iii) the Obligations;

(d) Take immediate possession of any of the Collateral, wherever located; require Borrower to assemble the Collateral, at Borrower's expense, and make it available to Lender at a place designated by Lender which is reasonably convenient to Lender; enter any premises where any of the Collateral should be located and keep and store the Collateral on said premises until sold (and if said premises are the Property of Borrower, then Borrower agrees not to charge Lender for storage thereof); notify any other Person to make payment and performance directly to Lender; receive, endorse and collect all drafts, checks and other instruments for the payment of money made payable to Borrower representing any interest, payment of principal or other distribution payable in respect of any of the Collateral; file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender reasonably necessary or advisable for the purpose of collecting upon or enforcing any Collateral; and execute any instrument and do all other things deemed reasonably necessary and proper by Lender to protect and preserve and realize upon the Collateral or any portion thereof and the other rights contemplated hereby;

(e) Sell or otherwise dispose of all or any part of the Collateral at public or private sales, for cash or on credit, all as Lender in its discretion may deem advisable; and no demand, advertisement or notice, all of which are hereby expressly waived by Borrower, shall be required in connection with any sale or other disposition of all or any part of the Collateral, except that Lender shall give Borrower at least ten (10) days' prior notice of the time and place of any public sale or of the time and the place at which any private sale or other disposition is to be made, which notice Borrower hereby agrees is reasonable; all other demands, advertisements and notices are hereby irrevocably waived by Borrower;

(f) Petition for and obtain the appointment of a receiver, in accordance with applicable law, to take possession of any or all of the Collateral and business of Borrower and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver;

(g) Set off any Deposit Account maintained by Borrower with Lender and apply the balances therein to the payment of the Obligations; and/or

(h) Undertake any other remedy provided in any of the Loan Documents or as allowed by applicable law, including the UCC.

The proceeds realized from any sale or other disposition of any Collateral may be applied first to any expenses incurred by Lender and then to the remainder of the Obligations in such order of application as Lender may elect in its discretion, with Borrower remaining liable for any deficiency. Lender shall have no obligation to marshal any assets in favor of Borrower or any other party or against, or in payment of, any or all of the Obligations.

**7.3 Lender's Performance of Borrower's Obligations**. If any Obligor shall fail to discharge any covenant, duty or obligation under any of the Loan Documents, Lender may, in its discretion at any time or from time to time, for Borrower's account and at Borrower's expense, pay any amount or do any act required of any Obligor under any of the Loan Documents. All payments that Lender may make under this Section and all out-of-pocket costs and expenses that Lender pays or incurs in connection with any action taken by it hereunder shall be Lender Expenses. Any payment made or other action taken by Lender under this Section shall be without prejudice to any right to assert, and without waiver of, an Event of Default hereunder and without prejudice to Lender's right to proceed thereafter as provided herein or in any of the other Loan Documents.

**7.4 Waivers**. The acceptance by the Lender at any time and from time to time of part payment of the Note shall not be deemed to be a waiver of any Event of Default then existing. Lender's failure at any time or times to require strict performance by Borrower of any provision of this Agreement or any of the other Loan Documents shall not waive, affect or otherwise diminish any right of Lender thereafter to demand strict compliance and to performance with such provision. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on one occasion shall be deemed to be a continuing waiver or applicable to any other occasion. No delay by Lender shall constitute a waiver, election or acquiescence by Lender in any failure by Borrower strictly to comply with its Obligations under this Agreement and the other Loan Documents. No waiver on the part of Lender shall be effective or enforceable against Lender unless set forth in a writing signed by Lender.

**7.5 Remedies of Lender Cumulative**. All rights and all remedies available to the Lender hereunder or under the other Loan Documents shall be cumulative and in addition to all other rights and remedies granted to the Lender by contract at law or in equity, and may be exercised from time to time, and as often as may be deemed expedient by the Lender, whether the Note is due and payable and whether or not the Lender shall have instituted any suit for collection, foreclosure or other action in connection with this Agreement or the other Loan Documents.

**7.6 Standards Relating to Exercise of Remedies.**

(a) To the extent that any Requirement of Law imposes duties on the Lender to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that it is not commercially unreasonable for the Lender (i) to fail to incur expenses reasonably deemed significant by the Lender to prepare Collateral for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or

third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against other Persons obligated in respect of Collateral or to remove liens or encumbrances on or adverse claims against Collateral, (iv) to exercise collection remedies against other Persons obligated in respect of Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, regardless of whether the Collateral is of a specialized nature, (vi) to contact other Persons, regardless of whether in the same business as the Borrower, for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, regardless of whether such Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, (xi) to purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of Collateral or to provide to the Lender a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Lender, to obtain the services of brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any of the Collateral.

(b) Borrower recognizes that, by reason of certain prohibitions and limitations provided in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws, the Lender may be required, in certain instances regarding a sale of the Collateral to limit purchasers to those who agree, among other things, to acquire such Collateral for their own account, for investment and not with a view to the distribution or resale thereof. The Borrower acknowledges that any such private sales may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act), and, notwithstanding such circumstances, the Borrower agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Lender shall have no obligation to engage in public sales and no obligation to delay the sale of such Collateral for the period of time necessary to permit the issuer thereof to register such sale under the Securities Act or under applicable state securities laws, even if the Borrower would agree to do so.

(c) Borrower acknowledges that the purpose of this Section 7.6 is to provide non-exhaustive indications of actions or omissions by the Lender that would not be commercially unreasonable in the Lender's exercise of remedies with respect to the Collateral, and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 7.6. Without limitation upon the foregoing, nothing contained in this Section 7.6 shall be construed to grant any rights to the Borrower or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 7.6.

## ARTICLE VII
## MISCELLANEOUS

**8.1 General Indemnity**. In addition to and not in derogation of all other indemnities set forth in any of the Loan Documents, Borrower shall indemnify and defend the Indemnitees against, and hold the Indemnitees harmless from, any Indemnified Claim that arises out of or relates in any way to: the Loan; or any of the Collateral; this Agreement or any of the other Loan Documents (including any transactions entered into pursuant to any of the Loan Documents, Lender's Lien upon the Collateral, or the performance by Lender of Lender's duties or the exercise of any of Lender's rights or remedies under any of the Loan Documents); any Obligor's breach of, or failure to perform, keep or observe, any term, provision, condition, covenant or agreement in any of the Loan Documents; and/or any representation or warranty made by any Obligor in any of the Loan Documents. Additionally, if any Taxes (excluding taxes imposed upon or

measured solely by the net income of Lender, but including any intangibles tax, stamp tax, recording tax or franchise tax) shall be payable by Lender or any Obligor on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the other Loan Documents, or the creation or repayment of any of the Obligations under any of the Loan Documents, by reason of any applicable law now or hereafter in effect, Borrower shall pay (or shall promptly reimburse Lender for the payment of) all such Taxes, including any interest and penalties thereon, and will indemnify and hold Indemnitees harmless from and against all Indemnified Claims in connection therewith. The foregoing indemnities shall not apply to an Indemnified Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to have been incurred by any Indemnitee solely as a direct and proximate result of its own gross negligence or willful misconduct or a breach of any Loan Document by Lender. Lender shall be entitled to rely in good faith upon any writing or other document (including any email) or written or oral communication reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person (but Lender shall be entitled to such additional evidence of authority or validity as it may, in its sole and absolute discretion request, but it shall have no obligation to make any such request), and with respect to any legal matter, Lender may rely in acting or in refraining from acting upon the advice of counsel selected by it concerning all matters hereunder. If a claim or adjudication is made that Lender, or its agents or nominees, has acted unreasonably, or has unreasonably delayed acting, in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent or nominee, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. Borrower agrees that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**8.2 Third Parties**. All conditions of Lender's obligations hereunder are imposed solely and exclusively for the benefit of Lender, its successors and assigns. No other person or entity shall have standing to require satisfaction of such conditions in accordance with their terms, or be entitled to assume that Lender will refuse to make the Loan or other extension of credit in the absence of strict compliance with any or all of the terms and conditions hereof, and no other person or entity shall under any circumstance, be deemed to be a beneficiary of such conditions, any and all of which may be waived in whole or in part by Lender at any time and from time to time, in its sole discretion.

**8.3 Successors and Assigns**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties, provided that Borrower may not assign this Agreement, any of the other Loan Documents, or any rights or obligations hereunder or thereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void. Whenever in this Agreement one of the parties hereto is named or referred to, the successors, successors-in-title and assigns of such parties shall be included, and all covenants and agreements contained in this Agreement by or on behalf of Borrower or by or on behalf of Lender shall bind and inure to the benefit of their respective successors, successors-in-title and assigns, whether so expressed or not. No consent to an assignment by Lender shall release Borrower from its Obligations to Lender. Lender shall have the right, at any time and on any terms, all in Lender's discretion, to freely and absolutely assign, sell, transfer, convey and/or grant participations in: the Loan; any or all of the Loan Documents; and/or any or all of Lender's rights, title, remedies, interest, liabilities and obligations under the Loan Documents or in any way relating to the Loan or the Loan Documents. Lender will provide notice of any such assignment to Borrower. Lender shall have an absolute right in Lender's discretion to enter into one or more additional participation agreements with one or more participating lenders approved by Lender on such terms and conditions as Lender shall deem advisable. Borrower shall promptly execute and deliver to the Lender all such other and further documents, agreements and instruments, and shall do all such other acts or things, as Lender may request in Lender's discretion, to effectuate any such assignment, sale, transfer, conveyance and/or granting of a participation.

**8.4 Severability; Survival.** With respect to any provision of this Agreement finally determined by a court of competent jurisdiction to be unenforceable, such court shall have jurisdiction to reform such provision so that it is enforceable to the maximum extent permitted by law, and the parties shall abide by such court's determination. In the event that any provision of this Agreement cannot be reformed, such provision shall be deemed to be severed from this Agreement, but every other provision of this Agreement shall remain in full force and effect. Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, the obligations of Borrower and each of the Obligors with respect to each indemnity given by it in this Agreement or any of the other Loan Documents in favor of Lender shall survive the termination of this Agreement and the payment in full of the Obligations. All representations, warranties, covenants and agreements of Borrower herein and in any of the other Loan Documents shall survive the execution of this Agreement and the other Loan Documents, and the closing of the transactions described herein and therein.

**8.5 Modification; Entire Agreement.** No amendment or modification to or of this Agreement shall be effective except in a writing executed by Lender and Borrower. This Agreement and the other Loan Documents represent the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings, negotiations and inducements regarding the same subject matter.

**8.6 Counterparts.** This Agreement and any amendments hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.

**8.7 Governing Law.** This Agreement and all of the other Loan Documents shall be governed by and construed in accordance with the internal laws (but without regard to conflict of law provisions) of the State of South Carolina.

**8.8 Consent to Forum.** Borrower hereby consents to the non-exclusive jurisdiction of any United States federal court sitting in or with jurisdiction over the Eastern District of Tennessee or any state court sitting in Hamilton County, Tennessee, in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents and Borrower irrevocably agrees that all claims and demands in respect of any such action, suit or proceeding may be heard and determined in any such court and irrevocably waives any objection it may now or hereafter have as to the venue of any such action, suit or proceeding brought in any such court or that such court is an inconvenient forum. Nothing herein shall limit the right of Lender to bring proceedings against any Borrower in the courts of any other jurisdiction. Any judicial proceeding commenced by any Borrower against Lender or involving, directly or indirectly, any matter in any way arising out of, related to or connected with any Loan Document shall be brought only in a United States federal court sitting in or with direct jurisdiction over the Eastern District of Tennessee, Chattanooga Division or any state court sitting in Hamilton County, Tennessee. Nothing in this Agreement shall be deemed or operate to affect the right of Lender to serve legal process in any other manner permitted by law or to preclude the enforcement by Lender of any judgment or order obtained in such forum or the taking of any action under this Agreement to enforce same in any other appropriate forum or jurisdiction.

**8.9 Waiver of Certain Rights.** Borrower hereby knowingly, intentionally and intelligently waives (with the benefit of advice of legal counsel of its own choosing): **(a) THE RIGHT TO TRIAL BY JURY (WHICH LENDER HEREBY ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF, RELATED TO OR BASED IN ANY WAY UPON ANY OF THE LOAN DOCUMENTS, THE OBLIGATIONS OR THE**

**COLLATERAL;** (b) presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable and hereby ratifies and confirms whatever Lender may do in this regard; (c) notice prior to taking possession or control of any of the Collateral and the requirement to deposit or post any bond or other security which might otherwise be required by any Requirement of Law prior to allowing Lender to exercise any of Lender's self-help or judicial remedies to obtain possession of any of the Collateral; (d) the benefit of all valuation, appraisement and exemption law; (e) any claim against Lender on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of any of the Loan Documents, any transaction thereunder, the enforcement of any remedies by Lender or the use of any proceeds of the Loan; (f) notice of acceptance of this Agreement by Lender; and (g) the right to assert any confidential relationship connection with any information requested by Lender pursuant to or in accordance with this Agreement (and Borrower agrees that Lender may contact directly any such accounting firm and/or service bureau in order to obtain any such information).

**8.10 Time.** TIME IS OF THE ESSENCE WITH REGARD TO EACH AND EVERY COVENANT, AGREEMENT AND OBLIGATION OF BORROWER HEREUNDER AND UNDER ALL OF THE OTHER LOAN DOCUMENTS.

**8.11 Notices.**

(a) Except as otherwise provided herein, all notices, requests and other communications to or upon a party thereto shall be in writing and shall be given to such party at the address for such party as follows or at such other address as such party may hereafter specify by notice in accordance with the provisions of this Section:

| | |
|---|---|
| If to Borrower: | Lynskey Performance Products, LLC<br>3911 Volunteer Drive<br>Chattanooga, Tennessee 37416 |
| If to Lender: | FirstBank<br>c/o Terry Todd<br>319 Manufacturers Road<br>Chattanooga, Tennessee 37405 |

(b) Except as otherwise provided herein, each such notice, request or other communication shall be in writing and shall be effective only (i) three (3) Business Days after depositing the same in the U.S. Mail, with first-class postage pre-paid, addressed to the noticed party at the address specified herein, (ii) one (1) Business Day following the date deposited for overnight delivery with Federal Express or other national overnight carrier, or (iii) if given by personal delivery, when duly delivered with receipt acknowledged in writing by the noticed party. In no event shall a voicemail message be effective as a notice, communication or confirmation under any of the Loan Documents. Any written notice, request or demand that is not sent in conformity with the provisions hereof shall nevertheless be effective on the date that such notice, request or demand is actually received by the individual to whose attention at the noticed party such notice, request or demand is required to be sent.

(c) Notices and other communications may be delivered or furnished by electronic communication (including email and internet or intranet websites) pursuant to procedures approved by Lender in writing. Unless the Lender otherwise prescribes, (i) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgement from the intended

recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgement), and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its email address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

**8.12 Nature of Commitment**. With respect to each disbursement or advance of Loan proceeds hereunder, the Lender's obligations to make such disbursement or advance shall be deemed to be pursuant to a contract to make a loan or extend debt financing or financial accommodations to Borrower within the meaning of Sections 365(c)(2) and 365(e)(2)(B) of the Bankruptcy Code of the United States of America, 11 U.S.C. § 101 et seq., or any subsequent bankruptcy legislation in effect during the term of this Agreement.

**8.13 Relationship of Lender and Borrower**. Lender and Borrower intend that the relationship between them shall be solely that of creditor and debtor. Nothing contained in this Agreement or in the other Loan Documents, nor the consummation of the transactions contemplated herein or therein, shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture, or co-ownership by or between Lender and Borrower, or to create a relationship between Lender and Borrower other than that of creditor and debtor, or to cause the Lender to be liable or responsible in any way for the actions, liabilities, debts, or obligations of the Borrower.

**8.14 USA PATRIOT Act**. Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, Lender may be required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA PATRIOT Act.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first set forth above.

**LENDER:**

FIRSTBANK,
a Tennessee state bank

By: ______________________
Name: Terry Todd
Title: RM, VP

**BORROWER:**

LYNSKEY PERFORMANCE PRODUCTS, LLC,
a Tennessee limited liability company

By: ______________________
Name: MARK LYNSKEY
Title: MEMBER LLC